**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF: | No: CV-20-00855-PHX-JAT |
| Swift Air, L.L.C. | **ORDER** |
| Debtor. | |
| Redeye II, LLC, et al. | |
| Appellants, | |
| vs. | |
| MorrisAnderson & Associates Limited, | |
| Appellee. | |

Appellants Redeye II LLC, Jerry Moyes, Vickie Moyes, and the Jerry and Vickie Moyes Family Trust (collectively, "Appellants") appeal from the Judgment (the "Judgment"), (Doc. 1 at 9–12); the underlying Order Granting in Part and Denying in Part Motions for Summary Judgment re: Preference Claims Asserted by Trustee (the "Summary Judgment Order"), (Doc. 1 at 13–19); and the Under Advisement Order (the "Under Advisement Order"), (Doc. 19-2 at 65–262), entered by the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). In support, Appellants filed an Opening Brief. (Doc. 19). Appellee MorrisAnderson & Associates Limited ("Appellee" or the "Trustee") filed a Brief in response, (Doc. 25), to which Appellants filed a Reply Brief, (Doc. 27). Appellants also filed Objections to the Bankruptcy Court's Findings of Fact and

Conclusions of Law, (Doc. 20), and Appellee filed a Response to Appellants' objections, (Doc. 26). After reviewing the briefs and record, the Court issues the following order.

## I.   BACKGROUND

The below is a brief summary of the background of this case. A more extensive discussion of the background can be found in the Under Advisement Order, (Doc. 19-2 at 75–116), and Appellants' Opening Brief, (Doc. 19 at 10–14).

Prior to December 21, 2011, Swift Air, LLC ("Swift" or the "Debtor") operated as an aviation management company under a combined 14 CFR Part 121/135 Certificate ("Part 121 Certificate" and "Part 135 Certificate") issued by the Federal Aviation Administration ("FAA"). (Doc. 19 at 10). Swift's business involved managing aircraft owned by other parties and booking charter contracts. (*Id.*). Swift maintained a Part 135 Certificate business which managed corporate/individual charter flights (the "Part 135 Business"), and Swift also maintained a Part 121 Certificate business which consisted of flying large charter groups, in particular, professional sports teams (the "Part 121 Business"). (*Id.* at 11). Keeping the Part 121 Certificate operational required that certain criteria be satisfied, such as having five specific positions filled by qualified employees (the "Five Wise Men").[1] (Doc. 19-5 at 173–74).

Swift was a wholly owned subsidiary of Swift Aviation Group, Inc. ("SAG"). (Doc. 19-2 at 260). SAG also held all the equity interests in Swift Aviation Sales, Inc. ("Sales"), Swift Aviation Management, LLC ("SAVM"), and Swift Aviation Services, LLC ("Services"). (*Id.*). SAG was wholly owned by the Jerry and Vickie Moyes Family Trust (the "Moyes Trust"). (*Id.*). Jerry Moyes ("Moyes") was the sole trustee of the Moyes Trust. (*Id.*). The Moyes Trust also held all the equity interests in Transjet, Inc. ("Transjet"), Transjet's subsidiaries (the "Transjet Subsidiaries"), Transpay, Inc. ("Transpay"), and SME Steel Contractors, Inc. ("SME"). (*Id.*). Moyes also personally owned fifty percent of Redeye II, LLC ("Redeye"). (*Id.*). Moyes served as Swift's president, and Kevin Burdette ("Burdette") served as Swift's vice-president. (*Id.* at 78). The companies owned by Moyes

---

[1] The positions are Chief Pilot, Director of Operations, Chief Inspector, Director of Safety, and Director of Maintenance. (Doc. 19-5 at 174).

and the Moyes Trust regularly did business with one another and through this business incurred significant accounts receivable and accounts payable that were outstanding on December 21, 2011. (*Id.* at 77–87).

In 2011, Swift's balance sheet reflected liabilities that were greater than assets by more than $3 million. (*Id.* at 88). In the latter half of 2011, Burdette met with two potential buyers for Swift who ultimately did not purchase the company. (*Id.*). Then, in October 2011, Jeff Conry ("Conry"), on behalf of Avondale Aviation II, LLC and Jordan Gunthorpe Holdings, LLC (collectively, the "Buyers"), approached Burdette about purchasing Swift's Part 121 Business (the "Transaction"). (Doc. 19 at 11). Notably, the Buyers told Burdette that they only wanted to acquire the equity in Swift's Part 121 Business and that they intended to merge it with their recently acquired business, Direct Air, which needed a Part 121 Certificate. (Doc. 19-2 at 88–89). The Buyers also told Burdette that they planned to obtain a $5 million investment in Swift after its acquisition. (*Id.* at 90).

The Transaction moved forward, terms were solidified, and the Buyers closed on the purchase of the equity interest in Swift for a *de minimis* payment of $100 on December 21, 2011 (the "Transaction Date"). (Doc. 19 at 11–12). Swift's Part 135 Business was not included in the Transaction, so it was transferred into a newly created entity, Swift Aircraft Management, LLC ("SAM"). (*Id.* at 12). As part of the Transaction, Swift transferred certain assets and liabilities, including accounts receivable and accounts payable, associated with the Part 135 Business to SAM and SAG pursuant to the Part 135 Assignment and Assumption Agreement and Guarantee (the "Assignment and Assumption Agreement"). (*Id.* at 13). After the closing of the Transaction, Swift and the other Moyes owned companies executed an Inter-Company Settlement Agreement and Mutual Release (the "Settlement Agreement"). (*Id.*). The Settlement Agreement released Swift from any debts or obligations to the other Moyes owned companies and facilitated a transfer of assets and liabilities between Swift and certain other Moyes owned companies (the "Transfers"). (*Id.*). The Transfers included a receivable from SAVM (the "SAVM Receivable") and a receivable from Redeye (the "Redeye Receivable"). (*Id.*).

After the Transaction, the newly acquired Swift ("New Swift") experienced cashflow shortages. (Doc. 19-2 at 105). The $5 million investment that the Buyers planned to obtain for New Swift never materialized, and New Swift never merged with Direct Air. (*Id.* at 107). New Swift also entered into new post-Transaction contracts that exacerbated its money problems. (*Id.*). These and other problems led New Swift to commence a Chapter 11 bankruptcy proceeding on June 27, 2012. (*Id.*). New Swift emerged from its Chapter 11 bankruptcy proceeding through a confirmed restructuring plan in October 2013 after receiving approximately $6.3 million from Nimbos Holings, LLC ("Nimbos") in exchange for the equity interests in the reorganized New Swift. (Doc. 19 at 14).

On June 27, 2014, Appellee initiated the underlying adversary proceeding. (*Id.*). Appellee's Third Amended Complaint asserted, among other things, preference, fraudulent transfer, and breach of fiduciary duty claims against Appellants and others. (*Id.*). The Bankruptcy Court issued the Summary Judgment Order and held a trial after which the Bankruptcy Court issued the Under Advisement Order and the Judgment. (*Id.* at 8, 14). During the adversary proceeding, Appellants' expert, Grant Lyon ("Lyon") testified as did Appellee's expert, Michael Spindler ("Spindler"). (*See id.* at 23–24).

Appellants appealed the Judgment, the Summary Judgment Order, and the Under Advisement Order. (Doc. 1 at 6). Appellants filed an Opening Brief. (Doc. 19). Appellee filed a Brief in response, (Doc. 25), to which Appellants filed a Reply Brief, (Doc. 27). Appellants also filed Objections to the Bankruptcy Court's Findings of Fact and Conclusions of Law, (Doc. 20), and Appellee filed a Response to Appellants' objections, (Doc. 26).

## II.   LEGAL STANDARD

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a), which provides that "district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1). Matters referred to a bankruptcy court are classified as either "core" or "non-

core" proceedings. 28 U.S.C. § 157(b). Core proceedings are those "arising under title 11, or arising in a case under title 11," and non-core proceedings are those that are "otherwise related to a case under title 11." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). Bankruptcy court judges may enter final orders on all core proceedings and may submit proposed findings of fact and conclusions of law to the district court for entry of final orders on all non-core proceedings. *See* 28 U.S.C. § 157(b)–(c). Bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." *Id.* § 157(c)(2).

Regarding final orders by a bankruptcy court, this Court reviews a bankruptcy court's findings of fact under the clearly erroneous standard, and conclusions of law *de novo*. *In re Lazar*, 83 F.3d 306, 308 (9th Cir. 1996); *Granite State Ins. Co. v. Smart Modular Techs.*, 76 F.3d 1023, 1028 (9th Cir. 1996). Regarding proposed findings of fact and conclusions of law by a bankruptcy court, "any final order of judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). The Court may "accept, reject or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instruction." Fed. R. Bankr. P. 9033(d). In conducting a *de novo* review, the Court must consider a bankruptcy court's findings and conclusions and afford them no presumption of validity. *10 Collier on Bankruptcy* ¶ 9033.09[3] (16th ed. Rev. 2020).

## III.   ANALYSIS

Appellants make five arguments in their opening brief: (1) the Bankruptcy Court erred in determining that it had jurisdiction to enter a final judgment on preference claims under 11 U.S.C. § 547; (2) the Bankruptcy Court erred in determining that Swift was insolvent at the time of the Transfers under 11 U.S.C. § 547(b)(3); (3) the Bankruptcy Court erred by failing to apply a fair market value standard to certain receivables in the Transfers

for purposes of liability under 11 U.S.C. § 550; (4) the Bankruptcy Court erred in determining that Appellee satisfied its burden under 11 U.S.C. § 547; and (5) the Bankruptcy Court abused its discretion in taking judicial notice of certain facts. (Doc. 19 at 18, 22, 35, 37, 42). Appellants also filed objections to the proposed findings of fact and conclusions of law submitted by the Bankruptcy Court. (Doc. 20). These arguments and objections are addressed below.

A.    The Bankruptcy Court's Jurisdiction Regarding Preference Claims

1.    *Stern* Claims

While bankruptcy courts generally may enter final orders when adjudicating core proceedings, the Supreme Court held in *Stern v. Marshall* that Article III of the Constitution prohibits bankruptcy courts from finally adjudicating certain core bankruptcy-related claims. *Arkison*, 573 U.S. at 28 (citing *Stern v. Marshall*, 564 U.S. 462 (2011)). *Stern* explained that a bankruptcy court may not issue a final order "simply because a proceeding may have *some* bearing on a bankruptcy case." *Stern*, 564 U.S. at 499. "[T]he question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* Such statutorily core claims over which bankruptcy courts lack constitutional authority to enter final orders are known as "*Stern* claims." *Arkison*, 573 U.S. at 30–31. *Stern* claims are permitted to proceed before a bankruptcy court as non-core proceedings, and bankruptcy judges may only submit proposed findings of fact and conclusions of law to the district court for such claims. *Id.* at 36.

There is a "public rights" exception to the limitations in *Stern*. *Stern*, 564 U.S. at 465. A private right is one that arises from "the liability of one individual to another under the law." *Northern Pipeline Construction Co. V Marathon Pipe Line Co.*, 458 U.S. 50, 69–70 (1982) (citing *Crowell v. Benson*, 285 U.S. 22, 51 (1932)). A public right is one that is "integrally related to particular federal government action." *Stern*, 564 U.S. at 465 (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011); *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985); *Commodity Futures Trading*

*Comm'n v. Schor*, 478 U.S. 833, 844, 856 (1986)). It is not enough that a right be created by federal statute to qualify as a public right. *In re Bellingham*, 702 F.3d at 564. Matters involving public rights are those that are "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Id.* (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)). Thus, if a matter involves a public right, then the matter does not have to be decided by an Article III court, but can be adjudicated by a bankruptcy court, even if it qualifies as a *Stern* claim. *See In re Bellingham*, 702 F.3d at 559.

After *Stern*, the Supreme Court held that "Article III permits bankruptcy judges to adjudicate *Stern* claims with the parties' knowing and voluntary consent." *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1936 (2015). This means that bankruptcy courts may enter final orders on *Stern* claims with the involved parties' consent. *See In re Bellingham*, 702 F.3d at 566 (holding that a party's right to adjudication by an Article III court in a fraudulent transfer suit is waivable if the involved parties consent to adjudication by a bankruptcy court). If the parties do not consent to a bankruptcy court entering a final order regarding a *Stern* claim, then a bankruptcy court is to treat the matter as a non-core proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and judgment. *See Wellness Int'l.*, 135 S. Ct. at 1940. If a creditor files a claim against a bankruptcy estate, the creditor is considered to have consented to a bankruptcy court entering a final order on certain *Stern* claims, including preference actions. *Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990).

*Stern* dealt with the notedly narrow question of whether a bankruptcy court "lacked the constitutional authority to enter final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Stern*, 564 U.S. at 503. Since *Stern*, however, the Ninth Circuit has expanded the types of claims that are considered *Stern* claims to fraudulent transfer claims. *See In re Bellingham*, 702 F.3d at 565. This expansion was predicated, in part, on an examination of a party's right to a jury trial. *Id.* at 563 ("*Stern* fully equated bankruptcy litigants' Seventh Amendment right to a

jury trial in federal bankruptcy proceedings with their right to proceed before an Article III judge."). The *In re Bellingham* court reasoned that the Seventh Amendment right to a jury trial "is powerful evidence that congress also may not deprive such parties of their right to an Article III tribunal." *Id.*

Just like there is a jury right in a recovery action for fraudulent transfers, *Id.* at 565, there is a jury right in a recovery action for preferential transfers so long as the creditor who is the subject of the preference recovery has not filed a claim against the bankruptcy estate, *Langenkamp*, 498 U.S. at 45. In fact, the Supreme Court has held that preference actions are "indistinguishable . . . in all relevant respects" from fraudulent transfer actions. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 48–49 (1989). Thus, like fraudulent transfer actions, preference actions are *Stern* claims and bankruptcy courts lack the authority to issue final judgments or orders on them unless the creditor at issue has filed a claim against the bankruptcy estate. *See In re AWTR Liquidation Inc.*, 547 B.R. 831, 836 (Bankr. C.D. Cal. 2016).

### 2.   The Bankruptcy Court's Findings

The Bankruptcy Court found that it had the authority to enter final orders regarding preference claims against Appellants, even if they had not filed a proof of claim. (*See* Doc. 19-2 at 900). The Bankruptcy Court arrived at this determination after noting the "narrow" nature of *Stern's* holding and listing two specific criteria that the Bankruptcy Court argued excluded preference claims from *Stern*: (1) preference claims arise under federal bankruptcy law, and (2) preference claims are a part of the claims allowance process. (*Id.* at 898). These points are addressed below.

### a.   The "Narrow" Nature of *Stern's* Holding

The *Stern* court noted that their holding was a "narrow" one. *Stern*, 564 U.S. at 502 ("[W]e agree with the United States that the question presented here is a 'narrow' one."). The holding itself was simply that "[t]he Bankruptcy Court below lacked the constitutional authority to enter final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. Since *Stern*, this narrow holding

has been expanded by the Ninth Circuit to apply to fraudulent transfer claims. *See In re Bellingham*, 702 F.3d at 565. As preference actions are "indistinguishable . . . in all relevant respects" from fraudulent transfer actions, *Granfinanciera*, 492 U.S. at 48–49, *Stern's* holding should not be considered too narrow to include preference actions.

### b.     Arising Under Federal Bankruptcy Law

It is true that preference claims are not independent of federal bankruptcy law. *In re Kimball Hill*, 480 B.R. 894, 905 (Bankr. N.D. Ill. 2012). The fact that a claim is a federal-law claim, however, does not take the claim outside of *Stern*. *See Stern*, 564 U.S. at 492 (noting that the fraudulent transfer action in *Granfinanciera*, which arises from 11 U.S.C. § 548, could not be adjudicated by a non-Article III court). The claims that fall outside of *Stern* are public rights claims, *Stern*, 564 U.S. at 465, and simply because a claim arises in federal law does not mean that it is a public right, *In re Bellingham*, 702 F.3d at 564. Preference actions, although arising in federal law, involve private rights. *See Granfinanciera*, 492 U.S. at 34–35.

### c.     The Claims Allowance Process

While a preference claim can become part of the claims allowance process, it does not necessarily begin that way. If a bankruptcy estate collects on a preference claim against a non-creditor, the non-creditor defendant will then have a claim against the bankruptcy estate. (Doc. 19-2 at 898 (*citing* 11 U.S.C. §§ 502(d) and (h))). If a bankruptcy estate, however, does not collect on a preference claim against a non-creditor, the non-creditor defendant would not become a part of the claims allowance process because they would remain a non-creditor. Granting a bankruptcy court authority to issue final orders on preference claims against non-creditors because the estate *could* win on such a claim leads to circular reasoning: A bankruptcy court has authority in a preference claim against a non-creditor so long as the estate wins, and a bankruptcy court can decide that the estate wins so long as the bankruptcy court has authority.

The *Stern* court echoed this sentiment stating that if a "creditor has not filed a proof of claim, the trustee's preference action does *not* 'become[] part of the claims-allowance

process' subject to resolution by the bankruptcy court." *Stern*, 564 U.S. at 497 (alteration in original) (*quoting Langenkamp*, 498 U.S. at 45). Although, a preference claim can be resolved in bankruptcy court when the defendant has filed a claim against the bankruptcy estate "because *then* 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" *Id.* (alteration in original) (*quoting Langenkamp*, 498 U.S. at 44).

While the criteria used by the Bankruptcy Court bear on the holding in *Stern*, they are not dispositive when determining if a preference action is a *Stern* claim.

### 3.    Appellee's Arguments

Appellee's arguments on this issue primarily echo the findings of the Bankruptcy Court discussed above. (*See* Doc. 25 at 7–11). Appellee emphasizes the argument that the Bankruptcy Court had *in rem* jurisdiction over the preference claims. (*See* Doc. 25 at 8–11). Appellee's *in rem* jurisdiction argument is supported primarily by *In Re Dots, LLC*, a decision by the Bankruptcy Court of the District of New Jersey. (See Doc. 25 at 9–10 (citing *In re Dots*, 533 B.R. 432, 433 (Bankr. D.N.J. 2015))). Yet, the court in *In re Dots* does not discuss the public/private rights distinction from *Stern* that is at the core of the Ninth Circuit's decision in *In re Bellingham*. *See In re Dots*, 533 B.R. 432. Instead, the *in rem* jurisdiction argument appears to be based primarily on the fact that preference actions are products of the bankruptcy code. *Id.* at 433. It is not, however, enough that a right be created by federal statute to qualify as a public right and be excepted from *Stern*. *In re Bellingham*, 702 F.3d at 564.

Additionally, when discussing whether actions to recover preferential transfers pursuant to § 550(a) are correctly characterized as *in rem*, the Supreme Court has noted that "[t]he proper characterization of such actions is not as clear as [Appellee] suggest[s]." *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 372 (2006). In fact, the Supreme Court has directly rejected the idea that all preference actions fall within a bankruptcy court's *in rem* jurisdiction. *See United States v. Nordic Vill. Inc.*, 503 U.S. 30, 38 (1992) (holding that the preference action at issue was not subject to a bankruptcy court's *in rem*

jurisdiction). In *Nordic Village,* the Supreme Court found that because the recovery action sought "a sum of money, not 'particular dollars,' . . . there was no *res* to which the court's *in rem* jurisdiction could have attached." *Id.* (internal citation omitted).

While *In re Dots* holds that preference actions stem from the *in rem* jurisdiction of a bankruptcy court, this argument is not unassailable and seems inconsistent with the Ninth Circuit's holding in *In re Bellingham*. The Court is bound by Ninth Circuit precedent, and thus must find the *in rem* jurisdiction argument unavailing.

### 4.    Conclusion Regarding *Stern*

The claims at issue are preference claims arising under 11 U.S.C. § 547. Such claims are *Stern* claims, *In re AWTR Liquidation*, 547 B.R. at 836, and they do not fall under the public rights exception to *Stern*, *see Granfinanciera*, 492 U.S. at 34–35. Additionally, Appellants have not filed a claim against the bankruptcy estate or consented to final adjudication of the preference claims by the Bankruptcy Court. (Doc. 19 at 19; *see* Doc. 19-2 at 113–14 (listing entities that filed claims against Debtor and excluding Appellants)). Thus, the Bankruptcy Court did not have authority to enter a final order on the preference claims at issue. Instead, the Court will treat the Bankruptcy Court's order regarding the preference claims as proposed findings of fact and conclusions of law subject to *de novo* review per Federal Rule of Bankruptcy Procedure 8018.1.[2]

### B.    Findings of Fact

After thoroughly reviewing the parties' submissions, the record, and the proposed findings of fact issued by the Bankruptcy Court, the Court finds that the Bankruptcy Court's proposed findings of fact should be adopted in their entirety. In making this determination, the Court overrules each of the objections made by Appellants to the Bankruptcy Court's proposed findings of fact. The Court will address each objection to the factual findings in turn.

---

[2] This section of the Court's Order applies only to the instant preference claims. The Court makes no findings related to the Bankruptcy Court's authority regarding the other claims discussed in the Under Advisement Order.

1

2

### 1. Ehrlich's Red Flag Email matter-of-factly acknowledges that SAG was insolvent even before the Transaction.

3    Appellants object to the Bankruptcy Court's finding that Trial Exhibit 066,

4    November 29, 2011, Memorandum from Ehrlich to Burdette (the "Red Flag Email"),

5    acknowledges that SAG was insolvent before the Transaction, arguing that the Bankruptcy

6    Court conflated Swift with SAG. (Doc. 20 at 3). However, the Red Flag Email states that

7    pending litigation will not be commented on "given the insolvency of SAG." (Doc. 30-1 at

8    10). Additionally, the Bankruptcy Court clearly notes that SAG and Swift are different

9    entities in its Under Advisement Order. (*See, e.g.,* Doc. 19-2 at 81–82). The Bankruptcy

10   Court in no way confuses Swift with SAG and the letter clearly refers to SAG as insolvent.

11   The Court finds Appellants' objection to this finding is without merit and overrules it.

12

13

14

### 2. If Moyes could just get rid of Swift's 121 Business and have someone else pay for the Transjet Planes he could solve two important problems in one fell swoop.

15   Appellants object to the Bankruptcy Court's finding that the Transaction would

16   solve two problems for Moyes—the losses from the Part 121 Business and the personal

17   guarantee of leases for Transjet planes—in one fell swoop. (Doc. 20 at 3). Yet there is

18   significant evidence that both the Part 121 Business and Transjet leases presented problems

19   for Moyes that would be cured by the Transaction. The Red Flag Email states that "Swift

20   Air has always had losses," (Doc. 30-1 at 5), and Moyes's own testimony refers to the fact

21   that the Part 121 Business would be "a very long-term challenging project," (Doc. 19-3 at

22   794). Further, Swift's balance sheet showed liabilities significantly in excess of assets

23   leading up to the Transaction. (*See* Doc. 19-5 at 75). Additionally, Moyes had guaranteed

24   debts for Transjet planes that lease agreements with Swift were helping to pay. (Doc. 19-2

25   at 96–97; *see* Doc. 19-3 at 434–35).

26   Losses, long-term challenges, liabilities that overshadow assets, and guaranteed

27   debts are all appropriately described as problems that the Transaction would help solve.

28   Even if Moyes was prepared to continue enduring these problems indefinitely and was not

seeking a solution when the Buyers approached Swift, the Bankruptcy Court's factual finding is supported by the record. Thus, the Court overrules this objection.

### 3.      SAG transferred the SAVM Receivable to Moyes.

Appellants object to the Bankruptcy Court's finding that SAG transferred the SAVM Receivable to Moyes, arguing that this is not a fact in evidence. (Doc. 20 at 3). The Bankruptcy Court, however, supports this factual finding by citing Trial Exhibit 243, Swift Aviation Management Moyes Promissory Note Ledger, and the Joint Pretrial Statement. (Doc. 19-2 at 98). Both the trial exhibit and the Joint Pretrial Statement support the Bankruptcy Court's finding by showing that the amount of the SAVM receivable was added to a promissory note from SAVM to Moyes. (Docs. 30-1 at 13, 19-3 at 1234). Thus, the Court overrules this objection.

### 4.      Moyes testified it took about five years and $5 million worth of cash and time to obtain Swift's Part 121 Certificate. The Court found Moyes's testimony credible but not particularly revealing because he knew little about Swift's financial affairs and almost nothing about the Transaction.

Appellants object to the Bankruptcy Court's finding that Moyes's testimony on the cost and time required to obtain Swift's Part 121 Certificate was credible but not revealing. (Doc. 20 at 3–4). While Moyes testified that he believed the Part 121 Certificate cost about $5 million to obtain, he also testified that he could not justify that number or tell the Bankruptcy Court how he arrived at it. (Doc. 19-2 at 1044–45). Thus, even if Moyes's testimony is credible it is not very revealing as to how the cost of the Part 121 Certificate was calculated and what effects the timing and other specifics surrounding its acquisition may have played in that cost. The Bankruptcy Court noted that Burdette indicated that a confluence of factors impacted Swift negatively, along with the rest of the aviation industry, leading up to the Transaction. (*See* Doc. 19-2 at 173). Moyes's testimony about cost did not reveal how these factors may have impacted the value of a Part 121 Certificate.

Because Moyes provides no information about why the Part 121 Certificate cost $5

million to obtain years before the Transaction, his simple statement of a number is not particularly revealing as to the value of a Part 121 Certificate at the time of the Transaction and what impact the cost of obtaining such a Certificate would have on its value. Thus, the Court finds that the evidence supports this factual finding and overrules Appellants' objection.

### 5.  Spindler did not find anything suggesting charter contracts would add to the value of the holder of a Part 121 Certificate.

Appellants object to the Bankruptcy Court's finding that Spindler did not find anything suggesting Swift's charter contracts would add to the value of the holder of a Part 121 Certificate. (Doc. 20 at 4). Spindler testified that he found Swift's charter contracts to have no value because they were "generating operating losses" for Swift. (Doc. 19-2 at 969–71). Of course, had Spindler examined each contract individually, he may have determined that some specific contracts generated gains and others losses, but this would not change the fact that, on the whole, the contracts generated losses. So, while Spindler did not review each contract, he provided reasonable evidence that the charter contracts, as a whole, were not adding value to Swift.

Appellants further note that Spindler's own report shows "Cash in Escrow" of $1,656,297.00, "which represents customer deposits attributable to essentially 'pre-sold' Part 121 Business/Charter Contracts." (Doc. 19 at 31–32 (citing Doc. 19-5 at 104–05)). Appellants argue that this "Cash in Escrow" shows that the charter contracts had value such that they produced cash for Swift. This "Cash in Escrow" figure, however, does not show the value of the charter contracts, but simply shows payments related to the charter contracts. The "Cash in Escrow" figure neglects to reflect the costs of acquiring charter contracts, the costs of operating charter contracts, or the costs of collecting on the charter contracts. (*See* Doc. 19-5 at 104–05). The "Cash in Escrow" figure provides only a partial picture of the charter contracts, and so it cannot be used to successfully show that the charter contracts as a whole added value to the holder of a Part 121 Certificate. Thus, the evidence supports this factual finding and the Court overrules this objection.

6. **Buyers certainly knew at the Transaction Date that Swift was deeply insolvent on a book value basis. Since Buyers did not require a solvency opinion from Ehrlich or anyone else, the Court surmises that the Buyers knew Swift was insolvent on a fair market value basis but understood this Transaction would not occur if the Buyers insisted on a finding of solvency or Seller's warranty and representation of Swift's solvency.**

Appellants object to the Bankruptcy Court's finding that the Buyers knew that Swift was insolvent on a book value basis and a fair market value basis. (Doc. 20 at 4). The parties did not dispute that Swift was insolvent on a book value basis on the Transaction Date. (*See* Doc. 19-2 at 88). Burdette also testified that he discussed the capital needs for New Swift with the Buyers, and that the Buyers would require a capital infusion of $5 million for New Swift to be able to progress after the Transaction. (Doc. 19-3 at 445-46). In fact, Burdette testified that, without the $5 million capital infusion, he would not consider the Buyers to be serious purchasers for Swift (*Id.* at 448). This evidence is uncontroverted and shows that the Buyers likely knew that Swift was insolvent and would require a multi-million-dollar capital infusion to continue operating.

Additionally, there is ample evidence that Swift was insolvent on a fair market value basis on the Transaction Date. *See infra* Section III.D.1. Regardless of whether the practice of obtaining a solvency opinion is common in deals like the Transaction, the Transaction would not have occurred had the Buyers insisted on a finding of solvency or a warranty and representation of Swift's solvency. Thus, the evidence supports this factual finding and the Court overrules Appellants' objection.

7. **However, armed with its book of business and its Five Wise Men, in 2011 Swift was losing copious amounts of money. It needed to sell that business or shut its doors.**

Appellants object to the Bankruptcy Court's finding that Swift was losing money in 2011 and needed to be sold or close. (Doc. 20 at 4–5). Yet, the evidence shows that Swift

had always had losses and Swift's liabilities were significantly in excess of its assets. *See supra* Section III.B.2. Even if this financial downturn was due, in part, to the 2011 NBA strike, Swift's fortunes had yet to change at the time of the Transaction. Additionally, Moyes testified that he sold Swift based purely on Burdette's recommendation and did not even know the details of the Transaction. (Doc. 19-2 at 1066). So even if Moyes could have supported Swift moving forward, he likely would not have done so due to Burdette's recommendation. This coupled with the fact that Burdette stated that he and Moyes decided to enter into the Transaction or have Swift cease operations shows that the Bankruptcy Court's finding is amply supported by the record. (*Id.* at 88 (*citing* Declaration of Kevin Burdette at 5, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Mar. 22, 2018), ECF No. 258-3)). Thus, the Court overrules this objection.

8.      **Spindler adequately explains why the Arrow, Ryan, and Sky King bankruptcy sales of entities holding Part 121 Certificates are germane to a valuation of Swift's Part 121 Certificate.**

Appellants object to the Bankruptcy Court's finding that Spindler adequately explained how the Arrow, Ryan, and Sky King bankruptcy sales of entities holding Part 121 Certificates are germane to the valuation of Swift's Part 121 Certificate, arguing that no explanation is given for this finding and that even the Bankruptcy Court expresses doubts as to the applicability of these sales. (Doc. 20 at 5). Yet, the Bankruptcy Court and the report on which it relied gave several reasons for the applicability of these sales. These reasons include that: "The comparable sales . . . are relatively close in time to the Transaction," (Doc. 19-2 at 172); Swift declared bankruptcy approximately six months after the Transaction, so its financial position was similar to that of the companies examined, (Doc. 19-5 at 80); each comparable airline attempted to find a buyer for their Part 121 Certificate prior to their bankruptcy, (Doc. 19-5 at 81–85); and at the time of the Transaction, "many airline companies were unable to monetize any value for their Part 121 Certificates," (*Id.* at 85).

It is uncontested that Part 121 Certificates cannot simply be transferred or

purchased, but a buyer must acquire ownership in an existing company that holds a Part 121 Certificate or go through the process of obtaining a Part 121 Certificate from the FAA. (Doc. 19-3 at 1236). Thus, looking to prior sales of companies possessing a Part 121 Certificate is a reasonable step in valuing a Part 121 Certificate. Because no party could provide a comparable sale of an operating Part 121 Certificate in which the Part 121 Certificate was assigned value, the bankruptcy sales were the best alternative available.[3]

In making its finding, the Bankruptcy Court noted that, "[i]ntangible assets are always difficult to value and the values ascribed cannot be attained with absolute certainty." (Doc. 19-2 at 172). Given the difficult nature of such a valuation, any valuation would be subject to some level of doubt. But the Bankruptcy Court's proposed factual finding is well supported by the record, and the Court overrules this objection.

## 9. The Bankruptcy Court found a proposed bankruptcy sale for $1.1 million, subject to higher and better bids to be persuasive as to Swift's insolvency.

Appellants object to the Bankruptcy Court's finding that a proposed bankruptcy sale of New Swift for $1.1 million, free and clear of any debts, was persuasive arguing that this was merely an opening bid, that the Debtor abandoned the sale, and that New Swift was ultimately sold for $6.3 million. (Doc. 20 at 5). While the $1.1 million bid was simply an opening bid, it was agreed to by Conry on behalf of New Swift. (Doc. 19-3 at 162). Conry agreeing to an opening bid of $1.1 million for all of New Swift's assets, including the operating Part 121 Certificate, free and clear of any debts provides persuasive evidence that the value of New Swift's operating Part 121 Certificate was around $1.1 million. Because Swift's liabilities significantly exceeded $1.1 million, such a valuation would support a finding of insolvency. New Swift later abandoned this sale, (*See* Doc. 19-2 at 175), but that does not erase the fact that New Swift initially agreed to a bid for all assets,

---

[3] Spindler's Rebuttal Report cited the Mesaba Airlines transaction in which an operating airline with a Part 121 Certificate was sold in 2010. (Doc. 19-5 at 162–63). The Part 121 Certificate, however, was not assigned any value in this sale as $12 million was paid for Mesaba's intangible assets—which would include the Part 121 Certificate—with $.5 million being assigned to a non-compete agreement and $11.5 million being assigned to customer contracts. (*Id.*).

including the Part 121 Certificate, free of any debts for only $1.1 million.

While the ultimate sale to Nimbos for $6.3 million may provide some evidence of the value of New Swift's assets, it was a complex transaction that does not work to erase the acceptance of the $1.1 million bid. (*See* Doc. 19-5 at 188–271). Thus, the Bankruptcy Court's factual finding is supported by the record, and the Court overrules this objection.

> **10.** **While Appellants note that the ongoing Part 121 Business operations of Swift had value on the Transaction Date and that Swift's Five Wise Men were a part of that value, the Court finds such values are all subsumed within the Part 121 Certificate value found by Spindler.**

Appellants object to the Bankruptcy Court's finding that the values of the ongoing Part 121 Business operations and the Five Wise Men were subsumed within the Part 121 Certificate value found by Spindler because the models for a Part 121 Certificate sale used by Spindler did not have ongoing operations or the Five Wise Men. (Doc. 20 at 5–6). Spindler used bankrupt companies as models when valuing the Part 121 Certificate, but he and the Bankruptcy Court gave numerous reasons as to why this was an appropriate valuation method. *See supra* Section III.B.8. Most notably, the fact that there was no example of a sale close in time to the Transaction of an operating Part 121 Certificate airline in which the Part 121 Certificate was assigned a positive value shows that the bankruptcies provided the best models for valuation. *See supra* Section III.B.8.

Additionally, Swift was losing significant money through its operations and existing book of business, *see supra* Section III.B.7, and there was evidence that the charter contracts as a whole caused losses for Swift, *see supra* Section III.B.5. Thus, when valuing the Part 121 Certificate in the context of the entire business, the ongoing operations and existing charter contracts would not provide value outside of the Part 121 Certificate.

Each model Spindler used to arrive at his valuation of a Part 121 Certificate tried, and failed, to sell their operational Part 121 Certificate, and Swift was losing significant amounts of money even with its ongoing operations and book of business. Because of these

facts, the Bankruptcy Court's finding that the value of Swift's ongoing operations and Five Wise Men were subsumed within the Part 121 Certificate is well founded and the Court overrules this objection.

> **11.    The fact that Spindler's market research only pointed to Part 121 Certificates where the owner was in bankruptcy and not operating under their Part 121 Certificates only suggests to the Court that, in and around December 2011, there was little or no market for fully operational Part 121 Businesses similar to Swift's.**

Appellants object to the Bankruptcy Court's finding that there was little to no market for a fully operational Part 121 Certificate business similar to Swift's around the Transaction Date arguing that Spindler did not conduct appropriate research, did not use comparable airlines in his research, and did not use the Transaction as a comparable sale. (Doc. 20 at 6). While Appellants argue that Spindler did not conduct appropriate research, Appellants' expert provides no alternative research to show that better comparable transactions could have been used. (*See* Doc. 19-5 at 119–55). Additionally, while Appellants argue that the airlines used by Spindler were not comparable, the sales cited by Spindler were applicable to Swift's sale and Spindler adequately explained why they were comparable. *See supra* Section III.B.8.

Appellants further argue that the Transaction itself provides a comparable sale based, in part, on the fact that the Transaction was independently undertaken at arm's length. (Doc. 19-5 at 139). Appellants' expert, Lyon, defines "arm's length" as a transaction between two unaffiliated parties acting such that no conflict of interest arises. (*See id.* at 122). The Court agrees that the Transaction was at arm's length. There is no evidence that the Buyers and Swift had a conflict or affiliation at the time of the Transaction. However, the Court finds Appellants' contention that this then means that the Transaction itself can be used to show a market for an operational Part 121 Certificate to be overstated. While it is true that the Buyers were at arm's length, it is also true that the

Buyers did not personally guarantee or take on any of Swift's debt or pay more than *de minimis* value in exchange for the Part 121 Certificate. (Doc. 19-2 at 170–71). Instead, Buyers simply took equity ownership of Swift and its assets subject to Swift's debt for a *de minimis* payment of $100. (*Id.*).

Rather than show that there was a market for an operational Part 121 Certificate, such an arm's-length transaction more likely shows that the Buyers believed they could put Swift's assets to use regardless of the existence or lack of a market for operational Part 121 Certificates. Should the Buyers be wrong, they would not take on any personal loss for the Part 121 Certificate other than the $100 payment. Should the Buyers be right, they would realize benefits from a relatively low-risk venture. Thus, the Court is not persuaded by the Transaction itself that there was a market for operational Part 121 Certificates on the Transaction Date. The Bankruptcy Court's finding is supported by the record and the Court overrules this objection.

> **12.** **The comparable sales identified by Spindler were all preceded by pre- and post-bankruptcy efforts by those airlines to sell their business as fully operational 121 businesses. Each of those sellers could not obtain buyers despite concerted and professionally led efforts to do so.**

Appellants object to the Bankruptcy Court's finding that the failure of the comparative airlines used by Spindler to find buyers for their operational Part 121 Certificates suggest that there was little to no market for such Part 121 Certificates. (Doc. 20 at 6–7). Appellants argue that using the failures of the comparable companies to find that Part 121 Certificate airlines had "little or no value" is incorrect. (*Id.*). The Court agrees with Appellants that making such a bold finding would be incorrect. However, that is not what the Bankruptcy Court did. The Bankruptcy Court used the fact that comparable airlines could not find buyers for their operational Part 121 Certificates in conjunction with the other evidence regarding the value of Part 121 Certificates and determined that the appropriate valuation was $800,000, per Spindler's report. (Doc. 19-2 at 173). Thus, the

Court finds Appellants' objection to this finding is without merit and overrules it.

### C. Omissions of Fact

In addition to contesting the Bankruptcy Court's proposed findings of fact, Appellants argue that the Bankruptcy Court disregarded evidence without adequate explanation in contravention of Ninth Circuit precedent. (Doc. 20 at 7). After considering the parties' submissions, the record evidence, and the proposed findings of fact by the Bankruptcy Court, the Court finds that the additional factual findings proposed by Appellants are either not relevant, not supported by the evidence, or were considered by the Bankruptcy Court in making its proposed findings of fact. Thus, the Court overrules each of the objections made by Appellants regarding factual omissions and will address each objection in turn.

### 1. Pre-Transaction Historic Financial Condition

Appellants assert that the Bankruptcy Court should have made a finding that Swift had positive retained earnings for 2008–2010. (*Id.*). The Bankruptcy Court made such a finding when it discussed Swift's financial statements before the Transaction. (*See* Doc. 19-2 at 95–96). Such a finding did not overcome the record evidence showing that Swift was insolvent at the time of the Transaction. *See infra* Section III.D.1. Thus, Appellants' objection is without merit and the Court overrules it.

### 2. 121 Business versus 135 Business

Appellants assert that the Bankruptcy Court should have made a finding that Spindler's analysis did not differentiate between Swift's Part 121 Business and Swift's Part 135 Business. (Doc. 20 at 7–8). The Spindler report, however, very clearly differentiates between the businesses, and goes so far as to state what types of business each Certificate is connected to. (Doc. 19-5 at 69–71, 77). The exhibits that Spindler relied on and attached to his report also clearly delineate between the Part 121 Business and the Part 135 Business. (*See* Doc. 19-5 at 98, 100, 102, 105). Additionally, Spindler's insolvency analysis individually looked at Part 121 Business assets, namely the Part 121 Certificate. (*Id.* at 74–85). Thus, Appellants' objection is without merit and the Court overrules it.

1

### 3.    Decision to Sell and Timing of Sale

Appellants assert that the Bankruptcy Court should have made a finding that Moyes did not want to sell the company quickly around the time of the Transaction. (Doc. 20 at 8–9). Yet, the record shows that, leading up to the Transaction, Burdette and Moyes decided to either enter into the Transaction or have Swift cease operations. (Doc. 19-2 at 88 (*citing* Declaration of Kevin Burdette at 5, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Mar. 22, 2018), ECF No. 258-3)). Additionally, whether Moyes dictated the timing of the Transaction, he ultimately decided to sell Swift's Part 121 Business. Thus, whether Moyes had the ability to continue financing Swift or whether the Buyers dictated the speed of the sale is of little relevance, and the Court overrules this objection.

### 4.    Operational vs. Non-Operational Part 121 Certificates

Appellants assert that the Bankruptcy Court should have made a finding that there was a difference between an operational Part 121 Certificate and a non-operational Part 121 Certificate based upon Conry's testimony on the subject. (Doc. 20 at 9). The Bankruptcy Court discussed this point when examining Conry's testimony regarding the additional value had by an operational Part 121 Certificate. (Doc. 19-2 at 132 ("The fact that Swift was a going concern was useful because a non-operating Part 121 Certificate acquisition would take time and money to jump start.")). This difference was also considered by Spindler when making his report as he used a going concern standard when valuing Swift's assets. (*Id.* at 972). Thus, Appellants' objection is without merit and the Court overrules it.

### 5.    Valuation of Part 121 Certificate

Appellants assert that the Bankruptcy Court should have made a finding that Lyon's valuation of the Part 121 Certificate was appropriate, arguing that the Bankruptcy Court did not find that Lyon was "somehow not credible or disagree with any of his assessments." (Doc. 20 at 9–10). This statement by Appellants is glaringly incorrect. The Bankruptcy Court found that Lyon's analysis was "flawed for several reasons." (Doc. 19-2 at 170). Those reasons include finding the use of the Transaction itself to determine the value of

the Part 121 Certificate to be inappropriate, noting that Lyon gave no comparable sales of operating Part 121 Certificates in his analysis, and the failure to use the income, cost, or market approaches of valuation. (*Id.* at 169–72). Thus, Appellants' objection is without merit and the Court overrules it.

### 6. Part 121 Certificates Generally

Appellants assert that the Bankruptcy Court should have made a finding that keeping a Part 121 Certificate active required flying certain aircraft every 90 days and that the process for taking a dormant Part 121 Certificate to active status is nearly the same as starting the process anew. (Doc. 20 at 10). Such a finding would not have been relevant to the valuation of Swift's Part 121 Certificate. The Bankruptcy Court valued Swift's Part 121 Certificate on a going concern basis, so the similarity between having a dormant Part 121 Certificate and no Part 121 Certificate at all would not have impacted that valuation. *See supra* Section III.C.4. Thus, Appellants' objection is without merit and the Court overrules it.

### 7. Independent Verification of Part 121 Certificate Value

Appellants assert that the Bankruptcy Court should have made a finding that Lyon received independent verification that the cost to obtain a Part 121 Certificate was approximately $4–$6 million, arguing that this cost verification supports Lyon's valuation of the Part 121 Certificate. (Doc. 20 at 10–11). Yet, Lyon is very clear that a Part 121 Certificate cannot be valued as a standalone asset but must be valued as a part of the existing business to which it is attached. (19-3 at 997). Thus, determining the value of a Part 121 Certificate based on its general cost would seem faulty, as that analysis would ignore the critical parts of the business holding the Part 121 Certificate, like existing contracts and operating expenses. Certainly, if a Part 121 Certificate must be valued as a part of the existing business to which it is attached, then the value of the existing business must have an impact on the value of the Part 121 Certificate. Valuing a Part 121 Certificate based on the cost to acquire it would exclude the value of the business, be it positive or negative.

This is borne out by the record. Lyon himself agreed that if a party can buy an asset for less than the cost to build it up from scratch, then the cost approach is not an appropriate method for valuing that asset. (Doc. 19-3 at 1075). Spindler also notes that the cost method would be inappropriate for valuing a Part 121 Certificate at the time of the Transaction due to the ability to acquire an airline with an operating Part 121 Certificate for less than the cost to obtain a new Part 121 Certificate. (Doc. 19-5 at 79). Based on the record, even if Lyon's determination of cost to acquire a Part 121 Certificate was correct, due in part to the negative market forces in the airline industry at the time of the Transaction, cost was not an appropriate method to value Swift's Part 121 Certificate. (*See* Doc. 19-2 at 173). Thus, Appellants' objection is without merit and the Court overrules it.

### 8.    Owner's Opinion of Value

Appellants assert that the Bankruptcy Court should have made a finding regarding Burdette's opinion that the value of Swift's Part 121 Certificate was $5–$10 million, and that a Part 121 Certificate is an appreciating asset. (Doc. 20 at 11). The Bankruptcy Court, however, found Burdette's testimony to this point "not credible," and the Court agrees. (Doc. 19-2 at 173). Swift's books show that it only capitalized $1.4 million to obtain the Part 121 Certificate, (s*ee id.*), Burdette did not point to any figures to support his assertion, (*see* Doc. 19-2 at 454–55), $10 million is well over even the $4–$6 million valuation put on the Part 121 Certificate by Appellants' own expert, (Doc. 19-5 at 137), and Burdette turned down an offer to "replicate the [121] certificate" of a competitor for $5 million, (Doc. 19-5 at 369–70). Thus, the Court agrees with the Bankruptcy Court that Burdette's testimony is not credible and overrules the objection.

### 9.    Cost to Acquire Swift's Part 121 Certificate

Appellants assert that the Bankruptcy Court should have made a finding that the cost to acquire Swift's Part 121 Certificate was $6–$7 million. (Doc. 20 at 11–13). Swift's books don't support this cost conclusion, *see supra* Section III.C.8, but even if they did, the cost to acquire Swift's Part 121 Certificate has little bearing on its ultimate valuation, *see supra* Section III.C.7. The Bankruptcy Court correctly noted that, even if the cost of

Swift's Part 121 Certificate was $6–$7 million, that cost was years before the "apocalypse" that significantly hindered the aviation business. (Doc. 19-2 at 173). Thus, the Court overrules this objection.

### 10.    Primary Cause of 2011 Adverse Operations

Appellants assert that the Bankruptcy Court should have made a finding that the 2011 NBA strike "negatively and temporarily impacted [Swift's] operations" and "[kept] that fact in mind when determining that Swift's Charter Contracts had no value due to operational losses in the same time period." (Doc. 20 at 13). The Bankruptcy Court found that the 2011 NBA lockout impacted Swift's operations. (Doc. 19-2 at 88). Even after the 2011 NBA strike ended, though, New Swift continued losing money while holding these contracts. (*See* Doc. 25-7 at 2–18). Additionally, New Swift ultimately emerged from bankruptcy after "shedding numerous unfavorable customer contracts." (Doc. 19-2 at 177). Thus, the Bankruptcy Court's findings regarding Swift's customer contracts and operations is well supported by the record, and the Court overrules this objection.

### 11.    Replacement Cost for Part 121 Certificate

Appellants assert that the Bankruptcy Court should have made a finding that Spindler neither conducted an analysis of replacement costs for a Part 121 Certificate nor sought a third-party opinion on the replacement costs for a Part 121 Certificate. (Doc. 20 at 13). Of course, as discussed above, cost, replacement or otherwise, is not an appropriate method for valuing a Part 121 Certificate. *See supra* Section III.C.7. Thus, such a finding would not be relevant to the valuation of Swift's Part 121 Certificate, and the Court overrules this objection.

### 12.    Charter Contracts

Appellants assert that the Bankruptcy Court should have made a finding that Spindler did not review any of the contracts held by Swift at the Transaction Date, that neglecting to review individual contracts was an error, that the charter contracts had value, and that more contracts could have erased Swift's losses. (Doc. 20 at 13–14). It is true that Spindler did not read the individual contracts held by Swift when creating his report. (Doc.

19-2 at 1015). Spindler, however, considered the contracts in making his report, and found that they did not add value to Swift's Part 121 Certificate because Swift was losing money on the contracts as a whole. (*Id.* at 1036–37). While some of the contracts may have added value, the evidence shows that the contracts as a whole continued to generate losses for New Swift after the Transaction. (*See* Doc. 25-7 at 2–18). In fact, upon emerging from bankruptcy, New Swift had shed many of their unfavorable contracts while retaining the favorable ones. (*See* Doc. 19-2 at 177). Thus, the Bankruptcy Court's findings regarding the contracts are supported by the evidence, and the Court overrules this objection.

### 13.    Tax Note

Appellants assert that the Bankruptcy Court should have made a finding that the promissory note calling for payment by SAG and SAM of up to $400,000 to New Swift was an asset of Swift on the Transaction Date. (Doc. 20 at 14). Yet, "SAG was simply a holding company with no business of its own and . . . SAM was a newly created entity with no demonstrated capitalization," (Doc. 19-2 at 101), and payments were never made on the tax note, (*Id.* at 1130). Thus, the record shows, and the Bankruptcy Court correctly found, that the tax note provided Swift no value, and this objection is overruled.

### 14.    Post-Transaction Losses

Appellants assert that the Bankruptcy Court should have made a finding that New Swift incurred post-Transaction losses. (Doc. 20 at 14–15). Regardless of any post-Transaction losses, Swift was insolvent at the Transaction Date. *See infra* Section III.D.1. Thus, the post-Transaction losses are not relevant to the preference claims at issue, and the Court overrules this objection.

### 15.    Swift Bankruptcy Sale

Appellants assert that the Bankruptcy Court should have made a finding that Nimbos's purchase of New Swift as New Swift exited bankruptcy was a comparable sale that provided evidence of Swift's value. (Doc. 20 at 15). The ultimate sale to Nimbos for $6.3 million, however, occurred only after significant financing had been secured, numerous unfavorable contracts were dropped by Swift, Swift was able to shed all of its

1    debt, and Swift was able to reduce its lease payments for certain aircraft. (*See* Docs. 19-5

2    at 188–271, 19-2 at 177). Thus, the facts do not support the assertion that the sale to Nimbos

3    was a comparable sale, and the Court overrules this objection.

4              **16.      Collectability of SAVM Receivable and Redeye Receivable**

5              Appellants assert that the Bankruptcy Court should have made a finding that the

6    SAVM and Redeye Receivables were not collectable and should have applied a fair market

7    value standard to these uncollectable receivables. (Doc. 20 at 15–16). It is true that SAVM

8    had no assets on their books and was not operating at the time of the Transaction, (Doc.

9    19-3 at 389, 209), and that Redeye likely did not have assets on their books capable of

10   paying the receivable held by Swift at the time of the Transaction, (Doc. 19-2 at 1027).

11   However, Swift never treated the SAVM Receivable as uncollectable by writing it down

12   in their books, and there was no evidence of any effort made by Swift to collect this

13   receivable. (Doc. 19-3 at 265–67).

14             Additionally, the representative for SAG, the parent of SAVM, testified that the

15   SAVM Receivable was a collectable asset because Moyes would "make it good." (Doc.

16   25-10 at 137–38). Burdette similarly testified that Moyes "funded" certain of his companies

17   to "help[] them out" when they could not make payments that were due. (Doc. 19-3 at 409–

18   10). Moyes also testified that he and his companies "had to pay our payables," (Doc. 19-2

19   at 1055), and that he would loan money to pay debts owed by, at least one of, his

20   companies, (*see id.* at 1067). The record reflects that Moyes was no stranger to loaning

21   money to his companies so they could satisfy their payables.

22             Further, the record reflects that Moyes realized at least the full face value of the

23   SAVM Receivable. (*See* Doc. 19-3 at 1234 ("The amount of the SAVM Receivable was

24   added to the balance due under a promissory note from SAVM to Moyes."); Doc. 19-5 at

25   2 (showing that after the transfer of the SAVM Receivable to Moyes, the Swift note payable

26   to Moyes was satisfied)). This evidence together supports the finding that the SAVM

27   Receivable was collectable.

28             Appellants conceded the collectability of the Redeye Receivable, among others. (*Id.*

at 909). Additionally, Swift never treated the Redeye Receivable as uncollectable by writing it down in their books, and there was no evidence of any effort made by Swift to collect this receivable. (Doc. 19-3 at 265–67). Thus, the evidence shows that the SAVM and Redeye Receivables were collectable, and the Court overrules this objection.

### 17.   Post-Bankruptcy Book Value of Part 121 Certificate

Appellants assert that the Bankruptcy Court should have made a finding that "[u]pon exiting bankruptcy, New Swift (as reorganized) placed a $5 million book value on the Part 121 Certificate on its books." (Doc. 20 at 16). Notably, at and immediately after the Transaction Date, Swift's books reflected a book value of $0 for the Part 121 Certificate. (Doc. 19-3 at 188–89). Additionally, Appellants' own expert agreed that the Part 121 Certificate's $5 million value listed on New Swift's balance sheet was not a definitive statement as to its value. (*Id.* at 1081).

The book value is not the standard by which Swift's insolvency was, or should have, been judged, as fair market value is the appropriate standard. (Doc. 19-5 at 74–75). Thus, the book value of $5 million placed on the Part 121 Certificate by New Swift is unreliable and not applicable to the fair market value analysis of insolvency. The Court overrules this objection.

### D.   Conclusions of Law

After thoroughly reviewing the parties' submissions and the conclusions of law by the Bankruptcy Court *de novo*, the Court finds that the Bankruptcy Court's conclusions of law should be adopted in their entirety. In making this determination, the Court further overrules each of the objections made by Appellants to the Bankruptcy Court's conclusions of law. The Court will address each objection in turn.

### 1.   The Bankruptcy Court's Determination that Swift was Insolvent at the Time of the Transfers Under 11 U.S.C. § 547(b)(3)

To prevail on a preference claim under 11 U.S.C. § 547, a trustee must prove that a debtor was insolvent at the time of the alleged transfer. *Id.* § 547(b)(3), (g). Because the Transfers took place more than 90 days prior to the bankruptcy filing, insolvency at the

Transfers is not presumed, but must be affirmatively proven. *Id.* § 547(f).  A trustee has the burden of proving all elements of a preference claim, including insolvency, by a preponderance of the evidence. 11 U.S.C. § 547(g).

A company is considered insolvent if, "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of [exempted property]." *Id.* § 101(32)(A). "If the debtor was a going concern, the court will determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *In re DAK Indus., Inc.*, 170 F.3d 1197, 1200 n.3 (9th Cir. 1999). Here, the parties agree that Swift was a "going concern" on the Transaction Date. (Docs. 19-2 at 150, 19 at 23, 25 at 12).

Appellants argue that Spindler's and the Bankruptcy Court's determinations of insolvency did not use the legally appropriate going concern standard, and that Lyon's determination of solvency used the appropriate standard. (Doc. 19 at 23–35). After considering the parties' submissions and a *de novo* review of the legal conclusions of the Bankruptcy Court, the Court finds that the Trustee affirmatively proved that Swift was insolvent on a going concern basis at the time of the Transfers.

### a.   Spindler's Valuation

Appellants contend that Spindler improperly relied upon liquidating valuations, rather than appropriate going concern valuations. (*Id.* at 23). Because the parties agree that Swift was a going concern at the Transaction Date, going concern valuations must be used to determine the value of Swift's assets. *In re DAK Indus.*, 170 F.3d at 1200 n.3. Here, the Bankruptcy Court found, and the Court agrees, that Spindler used going concern valuations when calculating the value of Swift's assets.

### i.   The Part 121 Certificate

The pivotal asset in this case was Swift's Part 121 Certificate. Spindler valued this asset at $800,000. (Doc. 19-5 at 85). To reach his valuation, Spindler used a going concern fair market valuation analysis. (*Id.* at 79–85). This analysis primarily examined comparable sales of Part 121 Certificates around the time of the Transaction. (*Id.*). Notably, these

comparable sales were sales of non-operating Part 121 Certificates, but Spindler adequately explained how these comparable sales were germane to the valuation of Swift's Part 121 Certificate. *See supra* Section III.B.8. Rather than show that Spindler was using liquidation values, the fact that the only comparable sales available were of non-operating Part 121 Certificates shows that there was little or no market for Swift's fully operational Part 121 Business. *See supra* Section III.B.11. This conclusion is supported by the fact that the comparable sales identified by Spindler were all preceded by unsuccessful pre- and post-bankruptcy efforts to sell the operational Part 121 Businesses. *See supra* Section III.B.12.

Appellants argue that the significant cost to obtain a Part 121 Certificate shows that the $800,000 valuation by Spindler uses liquidation values. (Doc. 19 at 23). Yet, because the value of a Part 121 Certificate is tied to the business, rather than independent, cost is not determinative as to value. *See supra* Section III.C.7. Thus, although Spindler reached his valuation conclusion, in part, by using comparable sales of non-operating Part 121 Certificates, he did not use liquidation valuations, but correctly used going concern valuations.

Appellants also contend that Spindler's valuation incorrectly "ascribed no value whatsoever to [Swift's] Charter Contracts." (Doc. 19 at 25). The reason that Spindler did not give a positive value to the charter contracts was because they were "generating operating losses" for Swift. (Doc. 19-2 at 969–71). Thus, Spindler's determination that the charter contracts did not add value to Swift's Part 121 Certificate was appropriate. *See supra* Sections III.B.5, III.C.12.

Appellants go on to argue that "Spindler did not conduct 'market research.'" (Doc. 19 at 29). Spindler, however, conducted market research using the internet to find publicly available data regarding the sales of airlines with a Part 121 Certificate. (Doc. 19-2 at 991–92). Notably, while arguing that Spindler did not conduct appropriate market research in identifying comparable sales, Appellants' expert does not provide any additional comparable sales to counter Spindler's research. (*See* Doc. 19-5 at 119–40, 165–85).

Appellants next argue that the comparable bankruptcies Spindler used were, in fact,

not comparable to Swift at all. (Doc. 19 at 24–25). While the comparable airlines may not have been in the exact same position as Swift at the time of the Transaction, (*see id.* at 29–30 (noting that Arrow Air was a cargo airline and that the comparable airlines were sold out of bankruptcy)), they were each airlines that held a Part 121 Certificate and unsuccessfully tried to sell that Certificate on the open market, (Doc. 19-5 at 81–85). Spindler adequately explains why the comparable transactions are germane to the valuation of Swift's Part 121 Certificate. *See supra* Section III.B.8. Appellants also contend that Spindler erred in failing to consider New Swift's own sale to Nimbos as a comparable sale, but the facts do not support the assertion that the sale to Nimbos was comparable. *See supra* Section III.C.15.

Appellants further contend that Spindler incorrectly ignored the $5 million book value listed by New Swift for the Part 121 Certificate after New Swift emerged from bankruptcy. (Doc. 19 at 26-27). Yet, Appellants' own expert agreed that the $5 million book value attributed to the Part 121 Certificate by New Swift was not a definitive statement as to its value because book value is an inappropriate way to value an asset like the Part 121 Certificate. (Doc. 19-3 at 1081). The record clearly shows that book value is an unreliable method to value a Part 121 Certificate, so Spindler was correct in focusing his valuation on the market standard, not a book value standard. *See supra* Section III.C.17.

Appellants also argue that Spindler erred in his conclusion that Swift's going concern value was subsumed by Spindler's Part 121 Certificate Valuation. (Doc. 19 at 31–35). However, as the record shows, Swift's operations were losing significant amounts of money. *See supra* Section III.B.7. These losses combined with the fact that the value of a Part 121 Certificate is tied to the existing business holding the Certificate, *see supra* Section III.C.7, show that Spindler was correct in his conclusion that Swift's going concern value was subsumed by Swift's Part 121 Certificate valuation. *See supra* Section III.B.10.

Spindler stated in both his trial testimony and his report that he used a going concern valuation to determine if Swift was insolvent at the time of the Transaction and Transfers. (Docs. 19-2 at 972, 19-5 at 75). Because Part 121 Certificates are inextricably connected

to the existing business that holds them, any value attributable to Swift's Five Wise Men, charter contracts, and industry goodwill was necessarily subsumed by the value Spindler placed on the Part 121 Certificate. The Court finds that the Bankruptcy Court was right to credit Spindler on this point, and that the Bankruptcy Court's application of the going concern legal standard was appropriate.

### ii.    Accounts Receivable and Accounts Payable

Spindler also examined Swift's accounts receivable and accounts payable. Using the likelihood of collectability of certain accounts receivable, Spindler adjusted the value of the accounts receivable on Swift's balance sheet. (*See* Doc. 19-5 at 85–86). Spindler determined that the accounts receivable had a fair market value of $579,364 and stated that this reflected a conservative adjustment based on New Swift's December 31, 2011, financial statements. (*See id.*). Because of the unlikely chance of collecting the accounts receivable examined by Spindler and New Swift's December 31, 2011, financial statements, the Court finds that the adjustment to accounts receivable was appropriate.

Spindler also added a $1.2 million Transjet account payable that Swift apparently did not include on its December 21, 2011, balance sheet. (*See id.* at 86–87). After reviewing the record, the Court finds that the adjustments made by Spindler to Swift's accounts payable were appropriate.

Ultimately, Spindler found that "[Swift's] liabilities exceed[ed] the Fair Market Value of [Swift's] assets by approximately $2.76 million as of the Transaction Date." (Doc. 19-5 at 87). Spindler arrived at this determination after examining Swift's balance sheets and making some changes by writing down certain uncollectable accounts receivable, including a Transjet account payable, and including the Part 121 Certificate value. (*Id.*). After reviewing the record, the Court finds that Spindler's determination that Swift was insolvent at the time of the Transaction is credible.

### b.    Lyon's Valuation

Appellants argue that Lyon, on the other hand, used going concern valuations and correctly determined that Swift was solvent at the time of the Transaction and Transfers.

(Docs. 19 at 22–34, 19-5 at 139). Lyon's finding of solvency is based on multiple factors including his valuation of Swift's Part 121 Certificate, the arms-length nature of the Transaction, and New Swift's ultimate purchase after emerging from bankruptcy. (*See* Doc. 19-5 at 135–139, 169–180). After reviewing Lyon's reports and testimony, the Court does not find Lyon's reasoning persuasive.

### i.      Valuation of Swift's Part 121 Certificate

When discussing the value of an operating Part 121 Certificate, Lyon notes his experience and contacts in the airline industry, and his knowledge of the cost to obtain a Part 121 Certificate. (Doc. 19-5 at 136–37). Through this experience, network, and knowledge, Lyon determined that the value of an operating Part 121 Certificate is $4–6 million. (*Id.* at 137). Lyon fails, however, to name any specific examples of himself or his contacts selling a Part 121 Certificate for $4–6 million.

Lyon instead relies on his determination of the cost to obtain a Part 121 Certificate to support his valuation. (Doc. 19-3 at 1002-04). Yet, Lyon is very clear that a Part 121 Certificate cannot be valued as a standalone asset but must be valued as a part of the existing business to which it is attached. (*Id.* at 997). Thus, determining the value of a Part 121 Certificate based on its general cost would seem faulty, as that analysis would ignore the critical parts of the business holding the Part 121 Certificate, like existing contracts and operating expenses. Certainly, if a Part 121 Certificate must be valued as a part of the existing business to which it is attached, then the value of the existing business must have an impact on the value of the Part 121 Certificate. Valuing a Part 121 Certificate based on the cost to acquire it would exclude the value of the business, be it positive or negative. *See supra* Section III.C.7.

Lyon also notes that to be approved for a Part 121 Certificate, a party must have the "Five Wise Men." (Doc. 19-5 at 173–74). Lyon testified to the time and challenge of hiring the Five Wise Men to highlight the expense in obtaining a new Part 121 Certificate, rather than purchasing an existing operational Part 121 Certificate. (Doc. 19-3 at 1004–06). Yet, Lyon fails to cite a specific example of a prolonged search for the Five Wise Men or costs

associated with that search. Instead, he simply notes that Mesa Air has been engaged in a search for one of the Five Wise Men for at least four months. (*Id.* at 1004–05).

Thus, while Lyon gives evidence that it can be costly and take considerable time to acquire a Part 121 Certificate, he does not provide evidence sufficient to support his assertion that an operating Part 121 Certificate has a value of $4–6 million.

### ii.   The Arms-Length Nature of the Transaction

Lyon reasons that the Transaction itself provides a comparable sale based, in part, on the fact that the Transaction was independently undertaken at arm's length. (Doc. 19-5 at 139). Lyon defines "arm's length" as a transaction between two unaffiliated parties acting such that no conflict of interest arises. (*See id.* at 122). Lyon asserts that the fact that the Transaction was undertaken at arm's length shows that Swift had a positive fair market value and was not insolvent at the time of the Transfers. (*Id.* at 170–73).

The Court agrees that the Transaction was at arm's length. There is no evidence that the Buyers and Swift had a conflict or affiliation at the time of the Transaction. However, the Court finds Lyon's analysis of this fact to be an oversimplification. While it is true that the Buyers were at arm's length, it is also true that the Buyers did not personally guarantee or take on any of Swift's debt, but simply took equity ownership of Swift and its assets subject to Swift's liabilities for a *de minimis* payment of $100. (Doc. 19-2 at 170–71).

Rather than show that Swift was solvent, such an arm's-length transaction more likely shows that the Buyers believed they could put Swift's assets to use regardless of its solvency. Should the Buyers be wrong, they would not take on any personal loss other than the $100 payment. Should the Buyers be right, they would realize benefits from a relatively low-risk venture. *See supra* Section III.B.11. Thus, the Court is not persuaded by the arm's length nature of the Transaction that Swift was solvent.

### iii.   New Swift's Purchase After Exiting Bankruptcy

Lyon further argues that New Swift's sale to Nimbos provides the best comparative sale to determine the value of Swift's Part 121 Certificate. (*See* Doc. 19-5 at 178–79). Though, this sale only occurred after New Swift secured significant financing, dropped

numerous unfavorable contracts, shed its debt, and reduced its lease payments for certain aircraft. *See supra* Section III.C.15. Thus, the facts do not support the assertion that the sale to Nimbos was a comparable sale.

After reviewing Lyon's reports and testimony, the Court does not find Lyon's reasoning persuasive. Lyon's valuation of the Part 121 Certificate, his reliance on the arms-length nature of the Transaction, and his use of Swift's purchase after bankruptcy to arrive at a conclusion of solvency are not supported by the record. Thus, the Court does not credit Lyon's determination that Swift was solvent at the time of the Transaction.

### c.     Conclusion Regarding Solvency

The Court finds Spindler's analysis regarding insolvency to be supported by the record and finds that Lyon's analysis is not. While Moyes and Burdette testified that it cost $4–$6 million to purchase the Part 121 Certificate, *see supra* Sections III.B.4, III.C.7–8, their testimony is not supported by Swift's books, *see supra* Section III.C.9. Even if the testimony on cost is credible, it is of little help in valuing the Part 121 Certificate as cost is not an appropriate means to value such an asset. *See supra* Section III.C.7.

The record supports Spindler's valuation of the Part 121 Certificate, Spindler's adjustments to accounts receivable, and Spindler's inclusion of the Transjet payable in Swift's accounts payable. The Court finds that the evidence, including Spindler's analysis, the proposed bankruptcy sale for $1.1 million, Burdette and Moyes decision to sell Swift or cease operations, and the fact that the promissory note from SAG and SAM was of no value all strongly support the finding that Swift was insolvent at the Transaction Date. Based on the foregoing, Appellants' objection is overruled, and the Court affirms the Bankruptcy Court's conclusion that Swift was insolvent at the time of the Transfers under 11 U.S.C. § 547(b)(3).

### 2.     The Bankruptcy Court's Valuation Standard for Certain Receivables in the Transfers for Purposes of Liability Under 11 U.S.C. § 550

"The purpose of § 550(a) is 'to restore the estate to the financial condition it would

have enjoyed if the transfer had not occurred.'" *In re Taylor*, 599 F.3d 880, 890 (9th Cir. 2010) (citing *In re Straightline Invs., Inc.*, 525 F.3d 870, 883 (9th Cir. 2008)). 11 U.S.C. § 550(a) states that, for an avoided preference transfer, "the trustee may recover, for the benefit of the estate, the property transferred, or, . . . the value of such property." Section 550(a) does not define value, but, "[t]ypically, courts equate 'value' with the fair market value of the subject property at the time of the transfer." *In re Brun*, 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007); *see* 5 *Collier on Bankruptcy* ¶ 550.02[3][a] (Richard Levin & Henry J. Sommer eds., 16th ed. 2017) ("When the value of the property is recovered, as opposed to the property itself, the term 'value' refers to fair market value."). "Where the value of the property cannot be easily or readily determined . . . the correct remedy is to return the property, not award an estimate of the value of the property." *In re Taylor*, 599 F.3d at 892.

Appellants argue that the Bankruptcy Court erred in valuing the SAVM and Redeye Receivables at their face value because neither of those receivables were collectable at the time of the Transfers, so they had no fair market value. (*See* Doc. 19 at 35–37). The Court, however, agrees with the Bankruptcy Court's factual finding that the SAVM and Redeye Receivables were collectable, *see supra* Section III.C.16, and had a fair market value equal to their face value.

Appellants argue that the Bankruptcy Court incorrectly determined "that the collectability of the SAVM Receivable was 'irrelevant' for preference purposes." (Doc. 19 at 35). The Bankruptcy Court, however, did not reason that the ultimate collectability of the SAVM Receivable was irrelevant, but found that "[w]hether the SAVM Receivable was collectible **on the Transaction Date** is irrelevant." (Doc. 19-2 at 190 (emphasis added)). Because, even if SAVM did not have the funds to pay its bills, Moyes would "make it good," *see supra* Section III.C.16, the fair market value of the SAVM Receivable was its face value, even if SAVM did not have the funds to cover the receivable on the Transaction Date. Additionally, the record shows that the benefit Moyes obtained from the receipt of the SAVM receivable was at least the face value of the SAVM Receivable. *See*

*supra* Sections III.B.3, III.C.16. Thus, the fair market value of the SAVM Receivable was "readily determinable," and the Bankruptcy Court arrived at the correct conclusion of law.

Appellants correctly state that "the proper focus in [Section 550(a)] actions is not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer." (Doc. 19 at 36 (citing *In re Maddalena*, 16 B.R. 551, 556–57 (Bankr. C.D. Cal. 1995))). Because both the SAVM and Redeye Receivables were collectable and had a fair market value that equaled their face value, the Bankruptcy Court correctly valued these receivables based on what the bankruptcy estate lost. Thus, the Court affirms the Bankruptcy Court's conclusion of law regarding the value of the SAVM and Redeye Receivables under 11 U.S.C. § 550 and overrules this objection.

### 3. The Bankruptcy Court's Determination that Appellee Satisfied its Burden Under 11 U.S.C. § 547(b)(1) and (b)(2)

To make a successful preference claim, a trustee must show that an alleged transfer was "to or for the benefit of a creditor" and "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(1)–(2). "Creditor" is defined as an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10). A "claim" is defined as the right to payment, whether such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C. § 101(5). While "antecedent debt" is not defined by the Bankruptcy Code, it is considered "a debt which is incurred prior to the relevant transfer." *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen*, 175 F. Supp. 2d 1180, 1202 (D. Ariz. 2001); *see In re Upstairs Gallery, Inc.*, 167 B.R. 915, 918 (B.A.P. 9th Cir. 1994). The burden is on a trustee to establish each element under § 547(b). *In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 967 (9th Cir. 2001).

The Bankruptcy Court determined on summary judgment that the relevant transfers satisfied 11 U.S.C. § 547(b)(1)–(2). (Doc. 19-2 at 151). The Court reviews the Bankruptcy Court's decision to grant summary judgment on an issue *de novo, In re Stanton*, 303 F.3d

939, 941 (9th Cir. 2002), and "may base [its] ruling on any ground supported by the record." *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 546 (9th Cir. 1991) (quoting *Gilbert v. Ben-Asher*, 900 F.2d 1407, 1410 (9th Cir. 1990)). "The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

### a.    11 U.S.C. § 547(b)(1) "To or for the Benefit of a Creditor"

On summary judgment, the Bankruptcy Court determined that "Moyes, Services, Sales, and the Transjet Subsidiaries were creditors for the Debtor on the Transfer Date." (Doc. 19-2 at 911). the Bankruptcy Court went on to conclude that the relevant transfers "were transferred to or for the benefit of creditors consisting of (a) Moyes, (b) Services, (c) Sales, and (d) the Transjet Subsidiaries," and that "the Trustee has satisfied its burden of proof under [11 U.S.C.] § 547(b)(1)." (*Id.* at 911–12). The Bankruptcy Court based this conclusion on the finding that certain accounts payable held by companies owned or controlled by Moyes were reduced through the transfers of certain accounts receivable held by companies owned or controlled by Moyes.[4] (*See id.*).

Appellants assert that, rather than accounts receivable being used to offset accounts payable, the Settlement Agreement and Transfers simply led to Moyes taking a loss on certain notes and new promissory notes to Moyes being created. (Doc. 19 at 38–39). However, the record shows the elimination of debts coinciding with the transfer of assets which supports the Bankruptcy Court's conclusion that the accounts receivable were used to offset the accounts payable and enable Moyes and his affiliated companies to receive more than they would in a future liquidation. (*See* Docs. 19-2 at 261, 25-5 at 2, 25-6 at 2, 19-2 at 908–912, 19-5 at 292–94 (citing exhibits that show the satisfaction of debts owed by Moyes affiliated debtors to Moyes affiliated creditors at the time of the Transfers)). Regardless of the terminology that is used for the accounts in the Transaction—paid,

---

[4] The details of the Transfers and Transaction are intricate, and the Bankruptcy Court provided an excellent summary titled "December 21, 2011 Transaction Chart," (Doc. 19-2 at 261). Appellants also provide a chart of receivables and payables at issue. (Doc. 19 at 37 n.36).

waived, settled, or written down—the Transaction ultimately worked to benefit Moyes and his affiliated companies. Moyes and his affiliated companies were creditors of Swift at the time of the Transfers, and the record shows that the Transfers were made to or for the benefit of Moyes and his affiliated companies. Thus, the Bankruptcy Court reached the correct conclusion in deciding that the burden under 11 U.S.C. § 547(b)(1) was satisfied.

> **b.** **11 U.S.C. § 547(b)(2) "For or on Account of an Antecedent Debt Owed by the Debtor Before Such Transfer was Made"**

On summary judgment, the Bankruptcy Court determined that "the Receivables were transferred to the Moyes Trust, or to Moyes at the same time that the Payables were settled, discharged, and/or released. The transfer of the Receivables was made for or on account of the Payables." (Doc. 19-2 at 912). The Bankruptcy Court went on to conclude that, "[t]he Payables were antecedent debts because the Debtor owed them to Moyes [and his affiliated companies] before the Transfer Date. Accordingly, the Trustee has satisfied its burden of proof under [11 U.S.C.] § 547(b)(2)." (*Id.*).

Appellants contend that the Bankruptcy Court reached the incorrect conclusion, and that the accounts payable were reduced because, "by virtue of the Settlement Agreement, the identified creditors could no longer seek payment from the Debtor and had to write down the value of receivables they were owed by the Debtor." (Doc. 19 at 39–40). However, the evidence supports the Bankruptcy Court's finding that the payables were reduced because of the transfer of the receivables that benefitted Moyes and his affiliated companies.

The Swift payable accounts at issue were antecedent debts. They appear on Swift's books before the Transfer, (Doc. 25-5 at 2), and thus they were "incurred prior to the relevant transfer," *Smith ex rel. Estates of Boston Chicken*, 175 F. Supp. 2d at 1202. The presence of the accounts payable on Swift's books shows that they were owed by the debtor, Swift, as required by 11 U.S.C. § 547(b)(2).

The transfer of the receivable accounts was made on account of the payable accounts. The representative for SAG, a Moyes owned company at the center of the

Transfers, stated that accounts receivable owed by other Moyes affiliates could be "offset" against "all the long-term liabilities" owed by different Moyes affiliates. (Doc. 25-10 at 138). The evidence shows that that understanding motivated the Transfers. The purchase agreement for the Transaction and the Settlement Agreement show that, around the same time the accounts receivable in question were transferred, the obligations for the accounts payable in question were released. (Docs. 19-4 at 42–43, 19-5 at 18–19). The evidence shows that the accounts receivable were transferred because of the accounts payable so that they could be offset. Thus, the Bankruptcy Court reached the correct conclusion in deciding that the burden under 11 U.S.C. § 547(b)(2) was satisfied.

### c.     Alter Ego Theory

Appellants' final contention on this point is that the Bankruptcy Court incorrectly concluded that Moyes had an interest in the Transfers through an improper application of alter ego theory. (Doc. 19 at 40–42). The Bankruptcy Court, however, did not pierce the corporate veil or allow claims seeking relief based on alter ego theories. (*See* Doc. 19-7 at 223–24). What the Bankruptcy Court allowed, though, was evidence that could support alter ego claims so long as it was only used to support other claims, like proving Moyes's interest in the Transfers. (*See id.*).  This evidence included the finding that SAG transferred the SAVM Receivable to Moyes, *see supra* Section III.B.3, the SAG representative testifying that the Moyes affiliates were run through Moyes and the affiliates' accounts were "all [Moyes]'s money anyway," (Doc. 25-10 at 138), Moyes testifying that there was "a different policy with respect to [collecting] intercompany payables then there were payables that were owed to unrelated parties," (Doc. 19-2 at 1055), and that Swift made no effort to collect certain Moyes affiliated receivables, (Doc. 19-3 at 265–67).

This evidence was not used to prove alter ego theories but was instead used to show that Moyes was a creditor who was benefitted by the Transfers. Appellants argue that such a showing defines the term "creditor" too broadly under 11 U.S.C. § 547(b)(1). (*See* Doc. 19 at 40–42). To support this argument, Appellants offer two cases: one from the Bankruptcy Court for the District of Kansas, *In re Hertzler Halstead Hospital*, 334 B.R.

276 (Bankr. D. Kan. 2005), and one from the Bankruptcy Court for the Northern District of Texas, *In re Southmark Corp.*, 138 B.R. 831 (Bankr. N.D. Tex. 1992).

The *In re Hertzler* court found that payments made by a bankrupt debtor to the owner of a creditor company were not preference payments because the owner was not a creditor, his company was. *In re Hertzler*, 334 R.R. at 289. In *In re Hertzler*, however, it was the defendant who asserted that he should be treated interchangeably with his company to avoid certain liabilities. *See id.* at 285. The court there found that such treatment is used to prevent fraud, so it would not be appropriately applied to help a defendant escape legitimate liability. *Id.* This is not the situation in the instant case, so the *In re Hertzler* analysis offers little guidance.

In *In re Southmark*, a parent company who guaranteed a subsidiary's debt to a third party argued that, because of the parent's guarantee, the subsidiary was a creditor of the parent under § 547(b)(1). *In re Southmark*, 138 B.R. at 832–34. The court there held that § 547(b)(1) could not be read so broadly as to define payments by parent guarantors on their subsidiaries' guaranteed debts as "to or for the benefit of a creditor." *Id.* at 834. To begin, the instant case does not present anything like the specific situation a parent guarantor lodging a preference claim against a subsidiary for payments made by the parent on the subsidiary's behalf, so *In re Southmark's* applicability is limited. Additionally, the Ninth Circuit has more broadly construed § 547(b)(1), finding guarantors and individual recipients of court-imposed restitution payments to be creditors. *See In re Sufolla, Inc.*, 2 F.3d 977, 979 (9th Cir. 1993) (finding a guarantor to be a creditor of the guaranteed debt under § 547(b)(1) because payment of that debt would be to the benefit of the guarantor); *In re Silverman*, 616 F.3d 1001, 1010 (9th Cir. 2010) (holding that restitution payments can be to or for the benefit of a victim and satisfy § 547(b)(1) even though a victim is not a direct creditor); *see also Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1190 (7th Cir. 1989) ("A payment ('transfer') by Firm to Lender is 'for the benefit of' Guarantor under § 547(b)(1) because every reduction in the debt to Lender reduces Guarantor's exposure.").

1    Further, in *In re Southmark*, the involved intercompany accounts receivable and

2    payable between the parent and the subsidiary were wholly unrelated to the preference

3    payment to an outside third party. *See In re Southmark*, 138 B.R. at 832. Thus, the *In re*

4    *Southmark* court held, that § 547(b)(1) could not be read so broadly to include a creditor

5    for debts wholly unrelated to the preference payment. *Id.* at 834. Here, the intercompany

6    accounts receivable and payable between related parties are the subjects of the preference

7    action at issue, so the *In re Southmark* analysis is inapplicable.

8    In the instant case, the Bankruptcy Court did not rely on disallowed alter ego

9    theories or err in determining that Appellee satisfied its burden under 11 U.S.C. § 547(b)(1)

10   and (b)(2). Thus, even viewing the evidence in the light most favorable to Swift, the Court

11   adopts the Bankruptcy Court's conclusion that Appellee satisfied its burden under 11

12   U.S.C. § 547(b)(1) and (b)(2) and overrules this objection.

13          **4.    The Bankruptcy Court's Conclusions Related to Capitalizing**

14                  **Versus Expensing Depreciable Assets**

15   Appellants argue that the Bankruptcy Court erred when it referenced Internal

16   Revenue Code § 263A and "implicitly found that Swift was a 'producer of real or tangible

17   personal property.'" (Doc. 20 at 17). To begin, Appellants' contention that the Bankruptcy

18   Court erred when it "implicitly found that Swift was a 'producer of real or tangible personal

19   property'" disputes a finding of fact and will be treated as such. *See R.P.-K ex rel. C.K. v.*

20   *Dep't of Educ., Hawaii*, No. CIV. 10-00436 DAE, 2012 WL 1082250, at *1 (D. Haw. Mar.

21   30, 2012) (citing *Ratanasen v. State of Cal., Dep't of Health Servs.*, 11 F.3d 1467, 1469

22   (9th Cir. 1993)) ("[T]o the extent any conclusions of law as stated may be deemed findings

23   of fact, they shall also be considered findings of fact."). Appellants appear to argue that,

24   because the Bankruptcy Court made this erroneous finding regarding cost to acquire the

25   Part 121 Certificate, it erred in valuing the Part 121 Certificate. This argument was

26   addressed *supra* in Parts III.C.7–8. Thus, Appellants' objection is without merit and the

27   Court overrules it.[5]

28   _____

[5] Even if this argument is a conclusion of law and the Bankruptcy Court erred in reaching
this conclusion, any resulting error would be harmless because, as the Court found *supra*

1

2

> ### 5.   The Bankruptcy Court's Taking of Judicial Notice of Certain Facts

3

4

5

6

7

Appellants' final argument on appeal is that the Bankruptcy Court erred in taking judicial notice of certain facts. (Doc. 19 at 42–46). Appellants contend the improperly noticed facts include an article by J.B. Heaton (the "Heaton Article") and "most of the material discussed in Section V.A–E of the [Bankruptcy Court's] Order." (*Id.* at 44, 42 n.41).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Federal Rule of Evidence 201, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9017, provides in relevant part, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may also take judicial notice of its own documents or documents filed before other courts. *See Kranich v. Girardi*, 720 F. App'x 870, 871 (9th Cir. 2018) (taking judicial notice of documents filed before another court); *Reyn's Pasta Bella, LLC v. Visa USA*, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (same); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (same). When a court takes judicial notice of another court's records, "it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). The decision to take judicial notice is reviewed for an abuse of discretion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019).

24

25

26

Appellants argue that the Bankruptcy Court citing the Heaton Article at notes 409 and 633 inserted "a new (and undisclosed) 'expert' witness after the close of evidence." (Doc. 19 at 45). The Bankruptcy Court, however, did not go so far. When referencing the

27

28

---

at Sections III.C.7–8, the cost to acquire a Part 121 Certificate is not indicative of a Part 121 Certificate's value. *See In re Manesh*, 774 F. App'x 413, 414 (9th Cir. 2019) (noting that Fed. R. Bankr. P. 9005 incorporates Fed. R. Civ. P. 61's harmless error rule into bankruptcy proceedings); *In re Schumacher*, 617 F. App'x 773, 774 (9th Cir. 2015) (same).

Heaton Article, note 409 states, in relevant part, that "[t]he [Bankruptcy] Court is not finding that a solvency opinion should have been obtained by [Appellants] in advance of the closing of the Transaction. However, the [Bankruptcy] Court does note that neither the [Appellants] nor the Buyers required a pre-Transaction solvency opinion concerning Swift." (Doc. 19-2 at 150 n.409). The Bankruptcy Court did not use the Heaton Article to make an adverse factual finding regarding Appellants' actions, but simply noted that solvency opinions are not uncommon for certain transactions. The same note cites the American Institute of Certified Public Accountants (AICPA) *Standards Regarding Valuation*—which Appellants requested the Bankruptcy Court take judicial notice of—to similarly support the point that business valuations, which include solvency opinions, are not uncommon in certain transactions, like acquisitions. (Doc. 19-2 at 150 n.409). Thus, the Bankruptcy Court did not improperly use the Heaton Article to make any findings at note 409. Even if the Heaton Article was improperly cited, any error was harmless as the AICPA *Standards Regarding Valuation* provide similar information.

When citing the Heaton Article, note 633 states, in relevant part, that "[t]he [Bankruptcy] Court does not find the [Appellants'] failure to obtain a solvency opinion as dispositive as to the question of solvency, but mentions the common practice of obtaining such opinions to further highlight another failure of [Appellants] to protect the interest of Swift in the lead up to the Transaction." (*Id.* at 224 n.633). Again, the Bankruptcy Court clearly did not use the Heaton Article to make an adverse factual finding, but simply to note the common practice of obtaining a solvency opinion in certain transactions. Thus, the Bankruptcy Court did not improperly use the Heaton Article to make any findings at note 633. Even if the Heaton Article was improperly cited, any error was harmless as similar information is contained in the AICPA *Standards Regarding Valuation*.[6]

Appellants' concern with notice being taken of "most of the material discussed in

---

[6] The Court further notes that any error in citing the Heaton Article regarding Swift's insolvency or Buyer's knowledge thereof is harmless because there is ample evidence in the record to support the findings that Swift was insolvent at the time of the Transaction, *see supra* Section III.D.1, and that the Buyers were aware of Swift's insolvency, *see supra* Section III.B.6.

Section V.A–E of the [Bankruptcy Court's] Order" appears to reference the notice of documents filed before other courts within those sections. (*See* Doc. 19-2 at 108–15). A court may take judicial notice of documents filed before other courts, not for the truth of the matters therein, but for their existence. *Lee*, 250 F.3d at 690. In the sections noted by Appellants, the Bankruptcy Court merely gives a summary of documents filed before other courts and does not opine on the truth of the allegations therein. Appellants argue that such notice is suspect because the Bankruptcy Court took notice on its own rather than "upon the request of a party to the dispute." (*See* Doc. 27 at 17). A court, however, "may take judicial notice on its own," and "may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(c)(1), (d). Thus, the Bankruptcy Court did not improperly take judicial notice of the filings in Sections V.A–E.

Appellants' final contentions on this point are that the Bankruptcy Court did not provide them with an opportunity to be heard regarding judicial notice and that the Bankruptcy Court never made any findings "as to the 'propriety of taking judicial notice' or 'the nature of the act to be noticed.'" (Doc. 27 at 18). Yet, Appellants submitted their concerns regarding judicial notice to the Bankruptcy Court, (*see* Doc. 19-7 at 475–81), and Appellants had an opportunity to be heard by the Bankruptcy Court on these objections, *see* Transcript of Hearing or Trial on 12/3/2019, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Dec. 12, 2019), ECF No. 549. It is clear from the transcript of the hearing before the Bankruptcy Court and from the Under Advisement Order that the Bankruptcy Court considered and rejected Appellants' objections. Thus, Appellants' contention here is without merit.

Because the Bankruptcy Court did not take improper judicial notice of certain facts, and even if it did, any error from such improper notice was harmless, the Bankruptcy Court did not abuse its discretion and Court overrules this objection.

## IV.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that the Bankruptcy Court did not have authority to enter a final

order on the preference claims at issue, so the Court considers the Bankruptcy Court's order as proposed findings of fact and conclusions of law subject to *de novo* review.

**IT IS FURTHER ORDERED** that Appellants' objections to the Bankruptcy Court's proposed findings of fact and conclusions of law are **OVERRULED**.

**IT IS FURTHER ORDERED ADOPTING** the Bankruptcy Court's proposed findings of fact and conclusions of law in their entirety.

**IT IS FURTHER ORDERED:**

Granting judgment in favor of Plaintiff avoiding the initial and subsequent transfers to or for the benefit of Defendants of the receivables owed to the Debtor as follows:

1.    The receivable owed by Redeye II, LLC in the amount of $4,174,301 (the "Redeye Receivable");

2.    The receivable owed by Swift Aviation Management, Inc. in the amount of $4,516,144 (the "SAVM Receivable");

3.    The receivable owed by Briad Development West, LLC in the amount of $1,053,936 (the "Briad Receivable");

4.    The receivable owed by SME Steel Contractors, Inc. in the amount of $589,620 (the "SME Receivable").

Granting judgment in favor of Plaintiff against the Jerry and Vickie Moyes Family Trust as to damages for the avoided Redeye Receivable, Briad Receivable and SME Receivable in the amount of $5,817,857.00, plus interest at the rate of 0.17% per annum from June 27, 2014 to the date of the judgment;

Granting final judgment in favor of the Plaintiff against Jerry Moyes and the marital community of Jerry Moyes and Vickie Moyes as damages for the avoided SAVM Receivable, Redeye Receivable and Briad Receivable in the amount of $9,744,381, plus interest at the rate of 0.17% per annum from June 27, 2014 to the date of the judgment; and

Granting final judgment in favor of the Plaintiff against Redeye II, LLC, a New Jersey limited liability company, as damages for the avoided Redeye Receivable and Briad Receivable in the amount of $5,228,237, plus interest at the rate of 0.17% per annum from

June 27, 2014 to the date of the judgment.

Granting the Plaintiff post-judgment interest on the foregoing amounts at the rate of 0.17% per annum from the date of the judgment until paid.

Pursuant to Bankruptcy Code, 11 U.S.C. § 550(d), Plaintiff is only entitled to a single satisfaction of the Redeye Receivable, SAVM Receivable, Briad Receivable, and SME Receivable.

Pursuant to Federal Rule of Bankruptcy Procedure 8024(a), the Clerk of the Court shall enter judgment accordingly.

Dated this 1st day of December, 2020.

James A. Teilborg
Senior United States District Judge